UNITED STATES, Appellee,

v.

Mark H. SHRADER, Defendant,
Appellant.

UNITED STATES, Appellee,

v.

Ricky GAGNON, Defendant, Appellant.

Nos. 94–1830, 94–2002.

United States Court of Appeals,
First Circuit.

Heard April 5, 1995.

Decided May 23, 1995.

Tony F. Soltani, with whom Soltani Law Office, Epsom, NH, was on brief, for appellant Mark H. Shrader.

Jonathan R. Saxe, with whom Twomey & Sisti Law Offices, Concord, NH, was on brief, for appellant Ricky Gagnon.

Jean L. Ryan, Asst. U.S. Atty., with whom Paul M. Gagnon, U.S. Atty., Concord, NH, was on brief, for appellee.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and BOUDIN, Circuit Judge.

BOWNES, Senior Circuit Judge.

In this appeal, defendants-appellants Mark Shrader and Ricky Gagnon challenge the sentences imposed upon them after they pleaded guilty to conspiring to possess marijuana with the intent to distribute it. Having carefully reviewed the record and considered defendants' arguments, we affirm.

### I.

The facts, which are derived from the presentence investigation reports and oral and

documentary evidence introduced at the sentencing hearings, are as follows.

In late 1991 or early 1992, Gagnon, then a Colorado resident, met with two co-conspirators—Lee Zahler and Robert Audette—at Bea's Restaurant in Epping, New Hampshire. Knowing that Gagnon had previously distributed marijuana in New Hampshire, Audette queried Gagnon about marijuana availability. Gagnon responded that, in Colorado, Audette could obtain large quantities of marijuana for a low price.

In February 1992, Zahler and Audette flew to Denver, Colorado. Gagnon picked them up at the airport and eventually took them to his residence in Aurora, Colorado, where they examined seventeen pounds of marijuana. Ten to twelve pounds of this marijuana were high quality; the rest, however, was moldy. Zahler expressed displeasure with the overall quality and the price of the marijuana he had examined.

At some point, Shrader—Gagnon's supplier—showed up at the Aurora residence. Gagnon introduced him to Zahler and Audette as "Mark" and "Bandido Mark." Shrader's nickname stemmed from his association with the Bandidos Motorcycle Club. After Zahler informed Shrader of his displeasure with the price of the marijuana he had seen, Shrader told Zahler he would have to go to Texas—the point of origin for the marijuana Shrader's associates were bringing into Colorado—if he wanted it any cheaper.

Zahler and Audette then discussed with Shrader the possibility of their purchasing fifty pounds of marijuana in Texas. They agreed that the Texas transaction would be "middled" by Gagnon, who knew Shrader's last name and how to reach him. Zahler and Audette also agreed to purchase the seventeen pounds of marijuana they had already examined. Subsequently, they concealed it in a couple of stereo speakers and shipped it back to New Hampshire. Gagnon received $850 for putting the deal together. Thereafter, Zahler and Audette returned home.

Later that month, Gagnon called Zahler and confirmed that Shrader could and would deal with Zahler and Audette in Texas. On March 4, 1992, Zahler and Audette flew to Austin, Texas, checked into the Radisson Plaza Hotel, and called Gagnon to let him know where they were staying. Later that same day, Shrader came to the hotel in order to view the $40,000 Zahler and Audette had brought with them in order to complete the fifty-pound deal discussed in Aurora. The deal was scheduled for the next day. Zahler became concerned, however, when he learned that, on the following day, there also would be a law enforcement convention at the Radisson Plaza. He and Audette therefore moved to a Holiday Inn. Because he had no other way to contact Shrader, Zahler called Gagnon in Colorado and informed him of his and Audette's new location. Despite the move, Audette's anxiety level increased and he flew back to New Hampshire.

At 6:00 p.m. on that same evening, Shrader showed up at the Holiday Inn with a marijuana sample. Zahler rejected it as low-quality. Shrader told him he could procure better marijuana, but that it would take some time. Shrader also told Zahler of his association with the Bandidos, and that the source of the marijuana was the president of the Bandidos' local chapter. Over the next couple of days, ten telephone calls were placed from Gagnon's Aurora, Colorado, residence to the Holiday Inn at which Zahler was staying. In addition, four calls were placed from Zahler's room to Gagnon's home in Aurora. Most of these calls were of short duration.

On March 7, 1992, Zahler purchased thirty-five pounds of marijuana from Shrader and four other men. The sale took place at the Holiday Inn. Zahler paid Shrader $31,500 in cash, of which Shrader took $3,200 for himself. One of the four other men present at the sale—the one who carried the duffel bag of marijuana into Zahler's room—was wearing Bandidos paraphernalia. Shrader accompanied this man into Zahler's room. Zahler subsequently shipped the thirty-five pounds of marijuana to an acquaintance in Haverhill, Massachusetts.

On August 25, 1993, a federal grand jury returned an indictment against Shrader, Gagnon, and six others. *Inter alia*, the indictment charged Shrader and Gagnon with conspiring to possess marijuana with the in-

tent to distribute it. 21 U.S.C. § 846. On December 1, 1993, the grand jury returned a superseding indictment against Shrader and seven others (including one of the original six co-defendants). On December 8, 1993, Gagnon pleaded guilty to the conspiracy charge. On March 1, 1994, Shrader followed suit.

## A. Shrader's Sentencing

On July 15, 1994, the district court sentenced Shrader. The court assigned Shrader a base offense level ("BOL") of eighteen based upon the fifty-two pounds of marijuana involved in the two deals. *See* U.S.S.G. § 2D1.1(c) (November 1, 1993) (drug quantity table). The court then added two levels because it determined that Shrader was a manager/supervisor of the offense, *see* § 3B1.1(c), subtracted two levels for acceptance of responsibility, *see* § 3E1.1(a), and arrived at a total offense level ("TOL") of eighteen.

Shrader's criminal history, which included, *inter alia,* five driving-while-intoxicated ("DWI") convictions, dictated that he be assigned a criminal history category ("CHC") of III. This assignment did not, however, take into account two of the DWI convictions and one careless driving conviction which involved Shrader's use of alcohol; nor did it take into account the fact that Shrader was arrested *again* for DWI (and for criminal mischief) after his guilty plea but prior to sentencing in this case, and that, in revoking Shrader's bail, the federal district court had found probable cause to believe that Shrader had driven while intoxicated. *See* § 4A1.1(c) (capping at 4 the number of CHC points to be assigned for previous sentences of less than sixty days). The record reflects that, in connection with prior sentences, Shrader had been ordered to complete substance abuse rehabilitation programs on at least three occasions.

Taking note of the uncounted conduct, the court decided to depart upward because Shrader's CHC significantly understated both his criminal history and his predisposition towards recidivist behavior. *See* § 4A1.3 (endorsing upward departures where the CHC "significantly under-represents the seriousness of the defendant's criminal histo-

ry or the likelihood that the defendant will commit further crimes"). Following the procedure prescribed in § 4A1.3, the court found that Shrader's criminal history most closely resembled that of a defendant with a CHC of IV. It then sentenced Shrader at the upper end of the guideline range applicable to a defendant with a TOL of eighteen and a CHC of IV: fifty-one months' imprisonment.

## B. Gagnon's Sentencing

On August 31, 1994, following a two-day hearing at which Gagnon testified that he was involved in the Colorado transaction but not the Texas transaction, the district court sentenced Gagnon. Relying on affidavits submitted by Zahler and Audette which stated that Gagnon had middled the Texas transaction, testimony from New Hampshire State Trooper Robert Quinn which, *inter alia,* vouched for Zahler's and Audette's credibility and rebutted Gagnon's testimony that he was never involved in any drug deals other than the one in Colorado, and documentary evidence of the phone calls between Gagnon's Aurora residence and the hotels in Austin at which Zahler and Audette stayed, the court rejected Gagnon's claim regarding the Texas transaction.

The court therefore assigned Gagnon a BOL of eighteen based upon the fifty-two pounds of marijuana involved in the two transactions. The court then added two levels for obstruction of justice (finding that Gagnon perjured himself at the sentencing hearing), *see* § 3C1.1, subtracted three levels for acceptance of responsibility, and arrived at a TOL of seventeen. There was no dispute that Gagnon's CHC was I. The court thereafter sentenced Gagnon near the lower end of the guideline range applicable to a defendant with a TOL of seventeen and a CHC of I: twenty-five months' imprisonment.

## II.

On appeal, Shrader assigns error to the district court's determinations that his CHC significantly underrepresented both his criminal history and his recidivist proclivities. Shrader also challenges the court's two-level manager/supervisor enhancement under

§ 3B1.1(c). Gagnon assigns error to the court's attribution to him of the thirty-five pounds of marijuana involved in the Texas transaction, and to its two-level enhancement for obstruction of justice. He also contends that he was deprived of his Sixth Amendment confrontation rights at his sentencing hearing. We discuss each appeal in turn.

### A. Shrader's Appeal

Shrader's challenge to his CHC enhancement is two-pronged. First, Shrader contends that a CHC of III does not "significantly under-represent[ ] the seriousness of [his] criminal history or the likelihood that [he] will commit further crimes." Second, he asserts that the extent of the departure was unreasonable in light of the departure-related circumstances. Neither argument persuades us.

■ We have observed:

[A]ppellate review of a decision to depart may involve three subsidiary questions: 1) review of the departure-related circumstances to determine whether or not they are of a kind or degree that they may appropriately be relied upon to justify departure; 2) review of the evidence to see if it supports the departure-related findings of fact; and 3) review of the record support for the direction and degree of departure.

United States v. Rivera, 994 F.2d 942, 950 (1st Cir.1993) (citation and internal quotation marks omitted). Shrader's second argument—which falls squarely within the third of these three categories—is subject to a deferential standard of review. Id. ("review of departure direction and degree will take place with full awareness of, and respect for, the sentencing court's superior feel for the case") (citation and internal quotation marks omitted).

Shrader's first argument falls within a subset of the first of these three categories, a subset described in Rivera as involving "a judgment about whether the given circumstances, as seen from the district court's unique vantage point, are usual or unusual, ordinary or not ordinary, and to what extent." Id. at 951 (contrasting this subset with the "quintessentially legal" type of category one question, which requires that we simply interpret the words of a guideline). Because a district court may have a better take on the unique circumstances of the particular case before it and is likely to have seen more "ordinary" Guidelines cases (and therefore will more readily recognize the extraordinary case), we review a district court's "unusualness" determination "with full awareness of, and respect for, the trier's superior feel for the case, not with the understanding that review is plenary." See id. at 951–52 (citation and internal quotation marks omitted). Thus, the district court's findings that a CHC of III significantly understated both Shrader's criminal history and his predisposition towards recidivist behavior are entitled to deference.

■ Shrader devotes great energy to arguing that his criminal history was accurately captured by CHC III, but spends little effort addressing the district court's determination that CHC III significantly under-represented the likelihood that he would commit further crimes. We note that this latter "recidivist determination" alone, if within the district court's discretion, is sufficient to support a departure. See § 4A1.3 ("A departure ... is warranted when the criminal history category significantly under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes.") (emphasis supplied). In this case, however, we think that the record evidence of Shrader's tendency to repeat the extremely dangerous offense of DWI is sufficient to uphold both of the court's findings.

We acknowledge that any criminal defendant with a CHC of III—which covers defendants with four to six criminal history points—is likely to have been convicted more than once and therefore likely to have exhibited some recidivist tendencies. See § 4A1.1 (assigning (a) three CHC points for each prior sentence exceeding one year and one month; (b) two points for sentences of more than sixty days not counted under section (a); (c) one point (up to a total of four) for sentences not counted under (a) or (b); and (d)–(f) additional points for specific offense

characteristics not relevant here). And we further acknowledge that, by capping at four the number of less-than-sixty-days sentences that can be counted, § 4A1.1(c) contemplates the disregarding of some misdemeanor criminal behavior. Even so, Shrader's record of persistently disregarding the law strikes us as unusual.

Because Shrader somehow never received a prison sentence of more than sixty days for any of his five DWI convictions, only three of these convictions (along with a fourth, non-DWI misdemeanor conviction) were counted for CHC purposes. Thus, as we have noted, Shrader's CHC did not take account of two DWI convictions. Nor did it take into account his careless-driving conviction. Finally, it did not take account of the DWI arrest on which the federal district court had held a probable cause hearing in revoking Shrader's bail. *See supra* at 291.

In all, Shrader's CHC took account of only three of *seven* incidents during which Shrader threatened the lives of himself and others by operating a motor vehicle while compromised by alcohol. And it did not account for the fact that Shrader had thrice been ordered to undergo rehabilitation programs designed to deter the very behavior underlying these incidents. In view of all this, we cannot say that the district court abused its discretion in determining that Shrader was more likely to commit further crimes than the typical defendant with a CHC of III. And in light of the life-threatening *nature* of the illegal conduct in which Shrader has repeatedly engaged, we cannot say that the court abused its discretion in finding that Shrader's criminal history is more serious than that of the typical defendant with a CHC of III.

■ Shrader also argues that the degree of departure—ten months beyond the upper end of the applicable guideline range—constituted an abuse of discretion. In so asserting, Shrader points out that even if his two other DWI convictions had been counted, he still would have had a CHC of III. He contends that, in essence, he was given a ten-month sentence for his most recent DWI arrest which, he asserts, should not have been considered at all. *See* § 4A1.3 ("a prior

arrest record *itself* should not be considered under § 4A1.3") (emphasis supplied). His argument completely overlooks the careless driving conviction and the court's probable cause determination on the most recent DWI arrest. More importantly, it disregards the recidivist implications of his constantly repeating the same dangerous criminal behavior despite previous sentences containing rehabilitative components aimed *directly at* the behavior. When evaluated in this context, Shrader's argument falls far short.

The record reflects that the court faithfully followed the recommendation of § 4A1.3 by determining that Shrader's criminal history and recidivist tendencies most closely resembled that of a defendant with a CHC of IV, and then sentencing Shrader within the guideline range specified for a defendant with a CHC of IV. The court's process and reasoning were impeccable, and resulted in a sentence that is facially reasonable. There was no abuse of discretion in the district court's degree of departure.

■ Shrader's challenge to the court's two-level manager/supervisor enhancement pursuant to § 3B1.1(c) requires less discussion. We review the court's determination only for clear error, *see United States v. Morillo*, 8 F.3d 864, 871 (1st Cir.1993), and perceive none here.

Shrader argues that the record, read in the light most favorable to the government, establishes no more than that he was a "steerer," a "go-between," or a "functionary" in the Texas and Colorado transactions. *See United States v. Sostre*, 967 F.2d 728, 733 (1st Cir.1992) (one who merely "steers" drug buyers to sellers ordinarily cannot be considered a manager/supervisor under § 3B1.1). Shrader misreads the record in making this argument.

As the district court observed in its detailed findings of fact, Shrader did far more than bring people together; he was, in fact, the principal through whom the Bandidos conducted the Colorado and Texas sales. At the meeting and sale in Aurora, Colorado, Shrader committed his organization—an organization with several other participants—to the deal subsequently consummated in

Texas. When Zahler balked at the quality of the marijuana first presented in Texas, Shrader stated that he could, and later did, procure higher-grade material. And Shrader oversaw the execution of the Texas deal; while another Bandido carried the marijuana into Zahler's hotel room, Shrader accepted and counted the money, and paid himself on the spot. In sum, Shrader managed the Colorado and Texas transactions, and supervised at least one other individual in the course of so doing. No more is required. *See* § 3B1.1, comment. (n. 2) ("To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants.") The district court's role-in-the-offense enhancement was not clearly erroneous.

### B. Gagnon's Appeal

■ Gagnon concedes that his challenges to the district court's attribution to him of the marijuana from the Texas transaction and imposition of the obstruction of justice enhancement (for denying involvement in the Texas transaction at the sentencing hearing) rise or fall on the sustainability of the court's *factual* finding that Gagnon was involved in the Texas transaction. Because the court's finding is easily sustainable, Gagnon's arguments necessarily fail.

■ We will affirm a district court's obstruction-of-justice enhancement unless it is clearly erroneous. *United States v. Ovalle–Marquez*, 36 F.3d 212, 225 (1st Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 947, 130 L.Ed.2d 891 (1995). And in the absence of clear error, so too will we affirm a district court's drug attribution, relevant-conduct determination, *United States v. Innamorati*, 996 F.2d 456, 489 (1st Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 409, 126 L.Ed.2d 356 (1993), and credibility assessment, *United States v. Olivier–Diaz*, 13 F.3d 1, 4 (1st Cir.1993). Thus, our inquiry reduces to whether the district court clearly erred in disbelieving Gagnon's testimony and finding that Gagnon was involved in the Texas transaction. We discern no clear error in the court's finding.

As we already have explained, the court premised its finding on the affidavits submitted by Zahler and Audette, the testimony from New Hampshire State Trooper Robert Quinn, and the documentary evidence of the phone calls between Gagnon's Aurora residence and the hotels in Texas at which Zahler and Audette stayed during the days preceding the Texas drug deal. Gagnon does not dispute that, if the Zahler and Audette affidavits are credited, this is a more than adequate basis to support the court's finding. He argues, however, that the court erred in crediting these "unreliable" affidavits over his own sworn testimony. He further contends that the other evidence is insufficiently corroborative or probative to ground the challenged finding. Because we disagree with Gagnon's argument regarding the Zahler and Audette affidavits, we need not consider the independent effect of Quinn's testimony and the telephone records.

■ It is settled that a "sentencing judge is vested with wide discretion to determine the information on which sentencing guideline decisions will be based, and may consider reliable hearsay evidence." *United States v. Montoya*, 967 F.2d 1, 3 (1st Cir.) (citation omitted), *cert. denied*, — U.S. —, 113 S.Ct. 507, 121 L.Ed.2d 442 (1992); *see also* § 6A1.3 (evidence with "sufficient indicia of reliability to support its probable accuracy" may be considered at sentencing "without regard to its admissibility under the rules of evidence applicable at trial"). The judge also has "wide discretion" in determining whether sentencing information is reliable. *Montoya*, 967 F.2d at 3 n. 6. Mindful of these tenets, we believe that the district court acted within its discretion in crediting the Zahler and Audette affidavits.

■ The thrust of Gagnon's argument is that Zahler and Audette, as cooperating co-conspirators, had such strong incentives to inculpate Gagnon that the largely uncorroborated statements contained in their self-serving affidavits should be rejected out of hand. While we certainly concede that uncorroborated, or largely uncorroborated, affidavits of cooperating co-conspirators should be viewed with some skepticism, we see no basis for adopting what would amount to a

*per se* rule of unreliability. We think the wiser course is to leave reliability decisions and credibility determinations to the informed discretion of the district court, while rigorously ensuring that defendants have a sufficient opportunity to impeach tenuous evidence in appropriate ways, such as through cross-examination or by the introduction of evidence of their own.

Here, the district court provided Gagnon with a fair process. The record shows that Gagnon had a full opportunity to tell the court his side of the story. Moreover, during his cross-examination of Quinn, Gagnon elicited the self-serving nature of Zahler's and Audette's cooperation with the government. Gagnon also was able to emphasize the almost complete absence of hard evidence corroborating the statements made in the affidavits.

 Gagnon makes a *post hoc* argument that he was entitled to cross-examine Zahler and Audette; indeed, he frames the argument as a constitutional challenge to his sentencing, arguing that it violated the Sixth Amendment's Confrontation Clause. Whatever merit there might be in the contention that the Confrontation Clause applies in situations such as this (and we take no position on the contention here, *but see United States v. Tardiff,* 969 F.2d 1283, 1287 (1st Cir.1992) ("in the usual case, a defendant's Sixth Amendment right to confront the witnesses against him does not attach during the sentencing phase")), Gagnon cannot assert it in this appeal because he did not attempt to call Zahler and Audette as witnesses at his sentencing, *cf. United States v. Garcia,* 34 F.3d 6, 10 n. 1 (1st Cir.1994) (sentencing challenges not first presented to the sentencing court are ordinarily waived on appeal). Application of the waiver rule is especially appropriate in this instance, where the district court indicated on the record that it would have allowed Gagnon to cross-examine Zahler and Audette had he so requested, *see United States v. Gagnon,* Cr. No. 93–61–02–JD, order at 2 (D.N.H. Sept. 13, 1994), and where the court's failure to order Zahler and Audette to appear cannot be considered plain error under Fed.R.Crim.P. 52(b).

In the end, we see no clear error in the district court's determination that Gagnon was involved in the Texas transaction. We accordingly reject Gagnon's challenges to the court's relevant conduct determination and to its two-level enhancement for obstruction of justice.

### III.

For the reasons stated, we *affirm* the sentences of defendants Mark Shrader and Ricky Gagnon.