UNITED STATES of America, Appellee,

v.

Yesid F. JIMENEZ MARTINEZ,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Alvaro MORENO, Defendant, Appellant.

Nos. 95–1511, 95–1569.

United States Court of Appeals,
First Circuit.

Submitted Jan. 8, 1996.

Decided April 24, 1996.

Lenore Glaser, Boston, MA, by appointment of the court, for appellant Yesid F. Jimenez Martinez.

Raymond E. Gillespie, Juneau, AK, by appointment of the court, for appellant Alvaro E. Moreno.

Michael J. Pelgro, Boston, MA, Assistant United States Attorney, with whom Donald K. Stern, Boston, MA, United States Attorney, was on brief, for appellee.

Before BOUDIN, Circuit Judge, COFFIN, and ROSENN,* Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

Defendant-appellants Yesid F. Jimenez Martinez and Alvaro E. Moreno pled guilty to narcotics offenses under 21 U.S.C. §§ 841(a)(1) & 846 arising from their participation in a cocaine conspiracy. At issue in this appeal are their claims of sentencing errors.

Both defendants challenge the district court's decision to hold them responsible for over five kilograms of cocaine (implicating the ten year minimum sentence under 21 U.S.C. § 841(b)(1)(A)(ii)), and the court's refusal to conduct an evidentiary hearing. Jimenez also contests the court's determination that his disclosure to a probation officer did not satisfy the requirements of the "safety valve" provision contained in U.S.S.G. § 5C1.2, which permits a judge to impose a sentence below the statutory minimum. Finally, Moreno asserts that the evidence was insufficient to warrant a two-level enhancement for obstruction of justice. Having concluded that the court considered insufficiently reliable evidence in determining the quantity of cocaine attributable to Jimenez, we vacate his sentence and remand for resentencing. As to all other issues, we affirm.

## BACKGROUND [1]

*Facts*

Defendants' involvement in the conspiracy began in the fall of 1993, with co-conspirator Christopher Fazio's efforts to broker a five-kilogram cocaine deal with an undercover agent. In an attempt to secure a source for the cocaine, Fazio contacted Moreno, who responded that he "would come through with the deal." A meeting ensued between Moreno, Fazio and the agent, where in contemplation of the five-kilogram deal, the parties agreed to a preliminary one-kilogram purchase to take place on November 10, 1993. On November 9, Moreno introduced Fazio to Jimenez, the "man who worked for him, that delivers coke for him, and ... [who] was the transporter." On November 10, Jimenez, accompanied by Fazio, delivered one kilogram of cocaine to the agent.

On December 30, further negotiations between Fazio, Moreno and the agent took place. Moreno proposed splitting the five-kilogram transaction into two separate sales. After two more meetings, the five-kilogram deal, to be broken up into two separate transactions, was scheduled for February 2, 1994.

On the morning of February 2, Moreno spotted surveillance agents outside his home, and cancelled the deal. Upon hearing of the cancellation, the agents left their positions outside Moreno's and Jimenez's homes, but returned a short time later. At that time, Jimenez was observed entering his home, followed shortly thereafter by co-conspirator Gabriel Uroujo Perez, who was carrying an empty shoulder bag. Uroujo exited with a

---

* Of the Third Circuit, sitting by designation.

1. We set forth the facts as derived from the uncontested portions of the Presentence Report (PSR), the transcripts of the sentencing hearings, see *United States v. Dietz*, 950 F.2d 50, 51 (1st Cir.1991), and the evidence adduced at trial, see *United States v. Hanono–Surujun*, 914 F.2d 15, 19 (1st Cir.1990).

full shoulder bag, later found to contain just over 2 kilograms of cocaine. A search of Jimenez's home uncovered an additional 123.8 grams of cocaine. The three kilograms that would have completed the transaction were never found.

Jimenez pled guilty to conspiracy to distribute cocaine, distribution of cocaine, and possession of cocaine with intent to distribute. Moreno went to trial, but, after the government rested its case, pled guilty to conspiracy to distribute cocaine, and distribution of cocaine.

### Sentencing: Jimenez

The probation department determined that Jimenez was accountable for 3.2615 kilograms of cocaine—the one kilogram sold on November 10, 1993 and the cocaine recovered on February 2, 1994. The government objected, contending that Jimenez should be liable for the whole five kilograms negotiated. On January 24, 1995, in response to the government's objections, Jimenez requested an evidentiary hearing and order to the Government "to present any witnesses it intends to use in support of its objections." This motion was denied.

Jimenez's sentencing hearing took place on April 3, 1995. In support of its position, the government relied on circumstantial evidence and one piece of direct evidence, an affidavit from co-defendant Ramin Mojabi, prepared on February 6, 1995, which stated that Jimenez was present during a December 30, 1993 meeting with Moreno and Fazio, and took part in discussions concerning the five-kilogram deal.

Notwithstanding Jimenez's challenges to the affidavit's reliability, the court found that Jimenez was aware of the object of the conspiracy, the five-kilogram deal, and was, therefore, responsible for the whole five kilograms. In addition, the court denied Jimenez the benefit of U.S.S.G. § 5C1.2, which permits a court to impose punishment without regard to the statutory minimum sentence. While Jimenez had provided information to the probation department, he did not apprise the United States Attorney's Office, and the court, therefore, found that he had not informed the "Government" as required by § 5C1.2(5). Consequently, Jimenez was

subject to the 10 year minimum sentence—not the applicable guideline range of 70–87 months—and was sentenced accordingly to 120 months incarceration.

### Sentencing: Moreno

Moreno's sentencing hearings took place on March 23 and April 6, 1995. On March 13, the court denied Moreno's motions for an evidentiary hearing and for issuance of subpoenas to co-conspirators Jimenez and Uroujo to appear as witnesses at his sentencing. At the first hearing, Moreno testified that his role in the conspiracy was limited to playacting the role of a drug dealer in order to assist Fazio. He further contended that because he did not have the capability to produce the additional three kilograms of cocaine on February 2, he could not be held responsible for the total negotiated amount of five kilograms. The court rejected these arguments, finding Moreno responsible for over five kilograms, and increasing his offense level by two in accordance with his role as a manager and supervisor in the conspiracy. See U.S.S.G. § 3B1.1(c).

The court further found that Moreno had phoned Fazio, and Moreno's wife had visited Fazio, in an effort to influence Fazio's testimony at Moreno's trial. Accordingly, the court enhanced Moreno's offense level another two levels for obstruction of justice. Moreno was sentenced to 188 months incarceration.

## DISCUSSION

### A. Sentencing Issues: Jimenez

#### 1. Quantity of Drugs

■ As we have often recognized, sentencing calculations for drug trafficking offenses are largely quantity-driven. See *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir.1993). In the conspiracy context, a defendant is accountable for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *United States v. Ovalle–Marquez*, 36 F.3d 212, 223 (1st Cir. 1994) (quoting U.S.S.G. § 1B1.3(a)(1)(B)). See also *Sepulveda*, 15 F.3d at 1197; *United*

*States v. O'Campo,* 973 F.2d 1015, 1026 (1st Cir.1992) ("[T]he base offense level of a co-conspirator at sentencing should reflect only the quantity of drugs he reasonably foresees it is the object of the conspiracy to distribute after he joins the conspiracy."). We review quantity determinations for clear error. *See United States v. St. Cyr,* 977 F.2d 698, 701 (1st Cir.1992).

Jimenez admits agreeing to store two kilograms of cocaine, but denies having any knowledge whatsoever of the secondary three kilogram transaction. He advances three related arguments against the court's decision holding him accountable for the whole five kilograms negotiated. First, he claims that the Mojabi affidavit was unreliable and should not have been considered by the court. Second, he argues that, at the very least, the court should have staged an evidentiary hearing. Finally, he contends that, without the affidavit, the court's determination was clearly erroneous.

*The Mojabi Affidavit*

The Mojabi affidavit was the only piece of direct evidence linking Jimenez to the five-kilogram deal.[2] In order to place the affidavit in context, we first provide in detail the circumstantial evidence before the court that, according to the government, demonstrated Jimenez's awareness of the deal:

1. Jimenez was introduced to Fazio as the person who worked for, and transported cocaine for, Moreno.

2. Moreno told the undercover agent that he intended to use Jimenez in connection with the five-kilogram sale, and Jimenez stored the first installment of two kilograms in his home.

3. Moreno told the agent that Jimenez had modified an automobile to transport up to ten kilograms; such an automobile was parked in Jimenez's driveway on February 2, 1995.

4. Moreno told the agent that his "friend" would deliver the five kilograms from New York; the automobile in Jimenez's driveway had a New York registration.

5. The kilogram recovered in November was wrapped in a bag from a store from Queens, New York; the automobile in Jimenez's driveway was registered to a man who lived in Queens; and the two kilograms recovered in February were wrapped in bags containing the logo of the New York Times—suggesting that the cocaine had a common origin.

6. Pen register information revealed that between January 6, 1994 and February 2, 1994, 59 calls were placed from Jimenez's residence to Moreno's. Nineteen of these calls occurred during January 29 and February 2, the days leading up to the deal.

7. Additional quantities of cocaine were found inside Jimenez's home—suggesting that larger quantities of cocaine had been stored there.

8. Jimenez and/or Moreno had ample opportunity to discard or remove the three kilograms of cocaine.

The government contends that Mojabi's affidavit was just one of many factors considered by the court, and that, even in its absence, there was sufficient evidence to support the court's finding. While we make no determination whether the circumstantial evidence considered alone could have supported the court's finding—*i.e.,* whether it would survive clear error review—we do not consider the evidence so substantial as to make consideration of the affidavit, if erroneous, harmless.

Three factors inform our conclusion. First, the court's question to the government during sentencing—"Don't I have to rely on Mr. Mojabi's affidavit in order to come to that conclusion [that Jimenez is responsible

2. Mojabi's affidavit, in pertinent part, provided:
 On the evening of December 30, 1993, Christopher Fazio took me to Moreno's home. "Fernando" [Jimenez] was also there. Moreno, Fazio, and "Fernando" were discussing the sale of five kilograms of cocaine to the undercover agent; they were talking about how many kilograms to sell at one time. Moreno stated that he could get as much as they wanted in New York and "Fernando" stated that he would deliver the cocaine and take the money. "Fernando" stated that he had done this before, that he was not afraid, and that he did not need a gun. "Fernando" also stated that he had previously lived in New York and that the people who owned the cocaine trusted him and had used him as a courier in the past....

for the five kilograms]"—indicates that Mojabi's affidavit was the key piece of evidence. Second, the probation department, considering the same circumstantial evidence, refused to deem Jimenez responsible for more than the recovered cocaine. Third, the evidence, though clearly confirming Jimenez's involvement in the conspiracy, is as consistent with Jimenez's participation in only the first stage of the transaction as his awareness of the whole transaction. Thus, because the affidavit appears to have been the crucial piece of evidence in the district court's finding of drug quantity, we must assess whether it was properly considered by the court.

■ At sentencing, the "court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a); *United States v. Tardiff,* 969 F.2d 1283, 1287 (1st Cir.1992). The court has wide discretion in determining whether sentencing information is reliable. *United States v. Shrader,* 56 F.3d 288, 294 (1st Cir. 1995); *Tardiff,* 969 F.2d at 1287.

In challenging the affidavit's reliability, Jimenez complains of 1) the lack of corroboration; 2) Mojabi's self interest to implicate Jimenez; and 3) the improbability that Mojabi could relate a discussion involving Jimenez, given that, purportedly, Mojabi did not speak Spanish and Jimenez did not speak English. We will address each of these in turn.

*Corroboration.* The affidavit, prepared on February 6, 1995, contained information that was not contained in the PSR, the government's objections to the PSR, witness testimony at Moreno's trial, or any contemporaneous document, despite the fact that Mojabi had been cooperating with the government since shortly after his arrest in February, 1994. Nor is the information in the affidavit corroborated by any of the circumstantial evidence delineated above. Indeed, the only substantiation the government can muster is that, on the day the meeting described in the affidavit took place, the agent observed Moreno, Fazio and Mojabi arriving together at the restaurant, supporting an inference, per-

haps, that Moreno, Fazio and Mojabi met together prior to their arrival. Jimenez, however, was not seen with the others.

*Self–Interest.* At sentencing, Jimenez contended that given the plea negotiations between the government and Mojabi, and even independent of any rewards or inducements relating to a plea agreement, Mojabi may have believed that it was in his interest to help the government convict Jimenez of a higher amount of cocaine. In response, the government stated that there was no written, signed agreement with Mojabi, but that any agreement reached would be breached by the proffering of dishonest information. In addition, the government asserted that Mojabi was seeking a § 5K1.1 departure, which applies only if the defendant provides truthful assistance. In other words, according to the government, Mojabi had an obligation, and every incentive, to tell the truth.

Alternatively, the government argued that by placing himself at the scene of the negotiations, Mojabi was subjecting himself to potentially greater criminal liability—demonstrative of credibility as a "statement against interest." Countering this assertion, Jimenez responded that, under U.S.S.G. § 1B1.8(a), any self-incriminating information could not be used against Mojabi.

*Language Barrier.* Finally, Jimenez contended that Mojabi and Jimenez do not share a common language, Jimenez speaking Spanish and having only minimal understanding of English and Mojabi speaking only English. As such, Jimenez argued that the affidavit was "ambiguous on its face." The government did not respond at sentencing to this point, which identifies a discrepancy not easily ignored. Mojabi did not refer merely to a simple remark. The affidavit purports to cover Jimenez's comments on the following subjects: the amount of kilograms to sell, his plan to deliver the cocaine and receive payment, his prior experience in delivery, his lack of fear, his lack of need of a gun, his prior residence in New York, the trust others had in him and their prior employment of him.

■ Separately, these types of complaints are unlikely to carry the day. As we have

previously indicated, courts may consider even uncorroborated affidavits. *See Shrader*, 56 F.3d at 294–95 (refusing to adopt a *per se* rule of unreliability for uncorroborated affidavits of cooperating co-conspirators). Moreover, a co-defendant's cooperation with the government does not make his statements inherently suspect. Finally, the resolution of factual discrepancies is especially within the court's domain.

We are nonetheless convinced that in this case the district court erred in relying on the Mojabi affidavit. Most significantly, Jimenez's claim, uncontested by the government at sentencing, that he and Mojabi shared no common language raised an important doubt about the reliability of the affidavit. Faced with this challenge to Mojabi's credibility, and with little other probative evidence of Jimenez's involvement with the latter transaction, the court should not have chosen simply to credit the affidavit without looking into the matter further.

We are also influenced, though to a lesser extent, by two other considerations: 1) there was little basis here on which to premise a credibility determination—the affiant had never appeared before the court or grand jury nor did anyone ever attest to his veracity; and 2) there was no corroboration whatsoever of the content of Mojabi's statement.[3]

Finally, in light of these circumstances, we are somewhat concerned by the court's failure to articulate any reason why the affidavit was reliable. After hearing counsel debate Mojabi's credibility, the court announced:

> I've considered the arguments of counsel and the submissions that were made to the Court before oral argument. And as a

result thereof, the Court finds that the defendant ... was aware of negotiations between the other codefendants and the undercover agent to sell at least five kilograms of cocaine....

Despite the clear dispute over reliability, the court did not mention the affidavit, or any other evidence, at all. While we assume that the "arguments" and "submissions" referred to included, *inter alia*, the Mojabi affidavit, indicating that the court found that the affidavit was reliable,[4] the court's conclusory pronouncement diminishes our confidence that it fully considered this important issue.

■ Most likely, doubts about the Mojabi affidavit could have been resolved by holding an evidentiary hearing, as Jimenez requested.[5] Such hearings may be burdensome, but the stakes here were high: the affidavit provided the crucial evidence of the amount of drugs that could be attributed to Jimenez, and as much as four years in prison were riding on the issue. While the district court has considerable discretion in deciding whether it has sufficient evidence upon which to make a finding at sentencing, here the district court's decision to rely on the affidavit without an evidentiary hearing was error.

The government contends that the court adequately dealt with the reliability issue by taking a full proffer from Jimenez of facts in support of his position. Such an opportunity may often be sufficient to allay reliability concerns. *See Shrader*, 56 F.3d at 295. But in this case, Jimenez's proffer raised an important doubt about the reliability of Mojabi's affidavit—the language discrepancy—that the government did not refute and that

---

3. The presence of these factors, whether alone or in conjunction, has often been significant in other cases where we have rejected challenges to the consideration of hearsay evidence at sentencing. *See, e.g., United States v. Shrader*, 56 F.3d 288, 291, 294–95 (1st Cir.1995) (witness vouched for the credibility of co-conspirators); *United States v. Williams*, 10 F.3d 910, 914–15 (1st Cir.1993) (hearsay testimony given in formal grand jury proceeding); *United States v. Montoya*, 967 F.2d 1, 3 (1st Cir.1992) (witness providing hearsay testimony cross-examined); *United States v. Zuleta–Alvarez*, 922 F.2d 33, 37 (1st Cir.1990) (testimony relied upon given at trial and before the grand jury and corroborated by many witnesses).

4. The government does not contest that the court considered the affidavit.

5. On January 24, 1995, Jimenez requested an evidentiary hearing. Though Jimenez did not formally renew this request at his sentencing hearing, both parties address the merits of the court's denial of his request. This is appropriate since Jimenez's challenge to the reliability of the affidavit is inexorably intertwined with his claim concerning the court's failure to hold an evidentiary hearing.

the court did not resolve; the affidavit was by far the most important evidence on the issue of drug quantity, and the stakes for defendant were extremely high.

We therefore vacate Jimenez's sentence and remand to the district court for resentencing in a manner consistent with this opinion.

2. *The Safety Valve Exception*

■ In 1994, Congress enacted 18 U.S.C. § 3553(f), which, in certain cases, limits the application of mandatory minimum sentences. Pursuant to this provision, when a convicted defendant meets five delineated requirements,[6] the district court "shall" impose a sentence in accordance with the guidelines without regard to any statutory minimum sentence. 18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2. The parties agree that Jimenez meets the first four requirements, but dispute whether Jimenez's disclosure to a probation officer, but not the United States Attorney, constitutes providing information to the "Government" as understood under § 5C1.2(5). We review this question of legal interpretation under the guidelines *de novo*. *United States v. Gary*, 74 F.3d 304, 315 (1st Cir.1996).

Neither the United States Code nor the Sentencing Guidelines contains a specific definition of "government." Jimenez thus advances a generic conception derived from a

dictionary: "the executive branch of the United States Federal Government." Jimenez asserts that this characterization includes the probation department. For additional support, Jimenez contends, correctly, that aspects of the sentencing procedures contemplate some disclosure to the probation officer. *See* U.S.S.G. § 6A1.1.

■ In resolving this issue, we are guided by the use of the word "government" in other relevant provisions, and by legislative history. Section 5C1.2 provides that "prior to its determination, the court shall afford the government an opportunity to make a recommendation" and cites Fed.R.Crim.P. 32(a)(1).[7] Section 5C1.2 comment. (n.8.). Under this procedural rule, "government" implicitly identifies the prosecutorial authority. *See United States v. Rodriguez*, 60 F.3d 193, 196 & n. 3 (5th Cir.1995) (relying on, *inter alia*, the doctrine of *in pari materia* in holding that statements to a probation officer do not satisfy § 5C1.2).[8]

We also think that § 5C1.2 is properly understood in conjunction with § 5K1.1, which authorizes downward departure upon the government's motion that the defendant has provided substantial assistance to authorities. The second clause of § 5C1.2(5)—securing the benefit of the "safety valve" even if the fully disclosing defendant "has no useful other information" or the "Government is

**6.** The provision and its guideline counterpart demand that

(1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
(3) the offense did not result in death or serious bodily injury to any person;
(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848; and
(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or

plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.
18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2.

**7.** The November 1994 Guidelines Manual refers to Fed.R.Crim.P. 32(a)(1). Pursuant to a 1994 amendment, Rules 32(c)(1) and (3) now address the sentencing hearing and contain material previously located in Rule 32(a)(1). Reflecting this change, the November 1995 Guidelines Manual cites Rules 32(c)(1) and (3).

**8.** Jimenez argues that if § 5C1.2 only contemplates communication with the prosecution, then the language of note 8 is surplusage. The language merely illustrates, however, that the court is not dependent on the recommendation of the prosecution, as it is with a § 5K1.1 departure, which requires a motion from the government.

already aware"—seems specifically designed to reward forthcoming defendants who cannot satisfy § 5K1.1. It seems evident that section 5K1.1's reference to the "government" and to "substantial assistance in the investigation or prosecution of another person" contemplates the defendant's provision of information useful in criminal prosecutions.

The house report accompanying the 1994 bill reinforces the notion that the provision requires disclosure of information of a type that would aid prosecutors' investigative work. It states that, "by the time of sentencing, the defendant must have *fully assisted* the Government by providing all relevant information regarding the offense." H.R.Rep. No. 460, 103d Cong., 2d Sess. (1994) (emphasis added). We think this contemplates more than the summary of the crime typically provided by a defendant to a probation officer. Our conclusion is further buttressed by the timing component of § 5C1.2(5)—requiring provision of all information to the Government "not later than the time of the sentencing hearing"—which necessarily anticipates communication that could occur after the creation of the presentence report, indicating that something other than ordinary disclosure to a probation officer is intended.

While full disclosure to the probation officer may assist the officer in preparing the defendant's presentence report, we do not believe that § 5C1.2 was meant to extend so far. The probation officer does not create a presentence report with an eye to future prosecutions or investigations. Indeed, in that context, the disclosure of one's role is the domain of "acceptance of responsibility." Section 5C1.2, like 5K1.1, requires more affirmative involvement in the prosecutorial function. *Cf. United States v. Wrenn*, 66

F.3d 1, 3 (1st Cir.1995) (requiring an affirmative act of cooperation). *See also United States v. Ivester*, 75 F.3d 182, 185 (4th Cir. 1996); *United States v. Acosta–Olivas*, 71 F.3d 375, 378 (10th Cir.1995) (stating that the defendant must disclose "everything he knows about his own actions and those of his co-conspirators.").

 In sum, we conclude that "government" in § 5C1.2(5) refers to the prosecutorial authority. Accordingly, we affirm the district court's holding that Jimenez did not satisfy the requirements of the "safety valve" provision.[9]

### B. *Sentencing Issues: Moreno*

#### 1. *Quantity of Drugs*

At the time of Moreno's sentencing, the sentencing guidelines provided:

> In an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount it finds the defendant did not intend to produce and was not reasonably capable of producing.

U.S.S.G. § 2D1.1 comment. (n. 12).[10]

The court found that Moreno "intended to produce ... and was reasonably capable of producing for sale such five kilograms of cocaine." It added, "part of the evidence supporting ... capability ... is the two kilograms that were seized ... on February 2, 1994." As a result, the court attributed six kilograms of cocaine to Moreno—the five negotiated and the one delivered in Novem-

---

**9.** We can conceive of circumstances where the objectives of the provision would arguably be met even though the defendant did not communicate directly with the government. For example, the defendant might advise a probation officer of his intent to reveal all relevant details as required by the provision and then disclose this information, which in turn is passed on to the government. We need not decide whether such unusual circumstances would satisfy § 5C1.2(5) because this is not such a case.

**10.** The Sentencing Commission amended note 12, effective November, 1995, by, *inter alia*, replacing the "and" in the last sentence with "or." *See* 1995 Guidelines Manual, App. C, Amend. 518. Nonetheless, we consider Moreno's claim in the context of the guidelines in effect in April, 1995, the time of his sentencing. *See* U.S.S.G. § 1B1.11(a).

ber—a quantity carrying a base offense level of 32.

 Moreno concedes his intent to produce five kilograms of cocaine, but contends that there is insufficient evidence that he was capable of producing the three kilograms that would have consummated the deal. We review factbound matters in sentencing for clear error, mindful that such factual findings need only be supported by a preponderance of the evidence. *United States v. Martinez–Martinez,* 69 F.3d 1215, 1224 (1st Cir.1995).

 Despite Moreno's efforts to distance himself from the two-kilogram seizure, it is a reasonable conclusion that the recovered cocaine constituted the first stage of the five-kilogram deal. In turn, it is entirely plausible to conclude that Moreno, having the capability to produce the first part of the deal, had the capability to consummate the deal, particularly when the two stages were to take place in close succession. *See United States v. Legarda,* 17 F.3d 496, 501 (1st Cir.1994) ("entirely plausible ... that defendant, having delivered eleven kilograms of cocaine one week, was capable of delivering ten kilograms the following week"). At the very least, we do not discern clear error.

 The government also argues, in the alternative, that under our recent precedent, Moreno's concession of intent is sufficient alone to render him liable for the whole negotiated amount. We agree. In *United States v. Pion,* 25 F.3d 18, 25 (1st Cir.1994), we concluded that the conjunctive phrasing of note 12 requires the sentencing court to include the weight negotiated unless the defendant establishes both lack of intent and

incapability. In a subsequent case, we stated "if the court finds by a preponderance of the evidence in regard to an aborted narcotics transaction that the defendant had either the intent or the capacity to deliver the full amount of the drugs under negotiation, then that amount must be included in the drug quantity calculation," *United States v. Muniz,* 49 F.3d 36, 39 (1st Cir.1995). Very clearly, then, Moreno's concession of intent also disposes of this issue.[11]

### 2. *Obstruction of Justice*

 Enhancement for obstruction of justice can be based on conduct "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1 comment. (n. 3(a)). The court found that Moreno "attempted to influence a witness in this case by actions of his own and through actions of his common law wife" and increased his offense level by two levels. We review the court's determination for clear error. *See United States v. Gonzales,* 12 F.3d 298, 299 (1st Cir.1993).

The PSR reported that Moreno, from prison, and his girlfriend contacted Fazio several times in an effort to induce him to testify that Moreno had a subordinate role in the conspiracy. Moreno, in his objections to the PSR and at his sentencing hearing, did not deny that he or his girlfriend had contacted Fazio but contended that he was trying to "urge him to tell the truth." In contrast, Fazio's testimony during Moreno's trial indicates that Moreno attempted to script his testimony.[12]

A. [by Fazio] What Moreno was telling me.
Q. What was he telling you?
A. Well, he was telling me to not testify against him, not to drown him and to try to save him.
Q. How did he want you to try to save him.
A. By not testifying against him.
Q. Did he tell you anything he wanted you to say?
A. Yes, he did.
Q. What was that?
A. To say that I was the big man and he was just a friend trying to help me out trying to find somebody.

11. Moreno cites the following language from an earlier case:
"Our case law has followed the language of this Commentary Note in a rather faithful fashion, requiring a showing of both intent and ability to deliver in order to allow the inclusion of negotiated amounts to be delivered at a future time." *United States v. Legarda,* 17 F.3d 496, 500 (1st Cir.1994). While this language supports Moreno's position, we are bound by the on point holdings of *Pion* and *Muniz. See United States v. Graciani,* 61 F.3d 70, 75 (1st Cir.1995).

12. The following exchange took place during a voir dire hearing relating to another matter:
Q. [by government] What was the phone call conversation about?

Credibility determinations at sentencing are the province of the court, and are scrutinized only for clear error. *United States v. Webster*, 54 F.3d 1, 5 (1st Cir.1995). Here, Moreno concedes that the communication took place. He admits to the basic content of the communication: asking Fazio to testify that his [Moreno's] role in the conspiracy consisted of acting the part of a drug dealer. Moreno's only offered justification is that he was encouraging Fazio to tell the truth. In our view, after presiding over Moreno's trial, and having extensive opportunity to observe Fazio and Moreno, the court's rejection of Moreno's version of events easily survives clear error review.

Moreno argues, further, that the court made no specific findings of the "words used, the speaker's meaning, or what a listener's reasonable interpretation would be." At sentencing, the judge is required to "state in open court the reasons for [the] imposition of the particular sentence." 18 U.S.C. § 3553(c). Here, the court stated its finding that Moreno attempted to influence a witness, a clear example of obstruction of justice. *See* U.S.S.G. § 3C1.1 comment. (n. 3(a)). The narrow scope of the issue in dispute, the specific findings in the PSR, which were adopted by the district judge as evidenced by the judgment form, and the extensive discussion at sentencing sufficiently enable effective appellate review. This was enough to satisfy § 3553(c). *See United States v. Catano*, 65 F.3d 219, 230 (1st Cir. 1995); *United States v. Schultz*, 970 F.2d 960, 963 & n. 7 (1st Cir.1992); *United States v. McDowell*, 918 F.2d 1004, 1012 (1st Cir. 1990).[13]

### 3. *Evidentiary Hearing*

Moreno's final challenge is to the court's refusal to compel Jimenez and Uroujo to appear as witnesses at his sentencing hearing. We review the court's denial of an evidentiary hearing for abuse of discretion. *United States v. Garcia*, 954 F.2d 12, 19 (1st Cir.1992).

At trial, the judge observed the government's case-in-chief, including recordings and videotapes of Moreno discussing the five-kilogram deal with Fazio and the undercover agent. Moreno had an opportunity to cross-examine Fazio and the agent, and succeeded in introducing Fazio's possible bias. And, at his sentencing hearing, Moreno testified extensively in support of his version of events. In sum, Moreno had a more than adequate opportunity to present information on any factor reasonably in dispute. *See* U.S.S.G. § 6A1.3(a). Further testimony from Jimenez and Uroujo would have served no purpose. Accordingly, we see no error in the court's refusal to issue subpoenas to these witnesses.

*The sentence of Jimenez is vacated, and the case is remanded for further proceedings consistent with this opinion and resentencing. Moreno's sentence is affirmed.*

---

13. Moreno argues that the court should have made specific findings in accordance with *United States v. Dunnigan*, 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). Since the obstruction of justice finding was not premised on perjury, *Dunnigan* does not govern.