UNITED STATES of America

v.

Richard P. SKODNEK, Defendant.

Cr. No. 94–10155–NG.

United States District Court,
D. Massachusetts.

June 12, 1996.

John F. Palmer, Law Office of John F. Palmer, P.C., Boston, MA, James P. Brady, Jeffrey Denner, Cuddy Bixby, Boston, MA, Theodore A. Barone, Perkins, Smith & Cohen, Boston, MA, for Defendant Richard P. Skodnek, M.D.

Michael K. Loucks, U.S. Attys. Office, Boston, MA, for U.S.

## MEMORANDUM AND ORDER

GERTNER, District Judge:

## I. INTRODUCTION

The defendant, Dr. Richard Skodnek, was charged with making false claims to the Medicare program, mail fraud, obstruction of justice and witness intimidation. *See* 42 U.S.C. § 1320a–7b, 18 U.S.C. §§ 1341, 1503 and 1512. The superseding indictment returned against him alleged essentially that Skodnek, a psychiatrist, engaged in various schemes to defraud insurance providers and the Medicare program by requesting payment for professional services he did not actually provide.[1] As charged, the period of

---

1. The superseding indictment was returned against Skodnek on November 9, 1994. It contained 136 counts. In particular, the counts alleged the following: Counts 1–80 detailed the government's allegations with respect to false claims to the Medicare program; counts 81–134 alleged mail fraud in connection with documents mailed to and from Bay State Health Care Foundation (BSHC), Blue Cross/Blue Shield, including Blue Cross/Blue Shield of Massachusetts (BCBSMA) and Blue Cross/Blue Shield Medex (Medex), and the Tufts Associated Health Plans (TAHP) (BayState Health Care was originally a separate insurance program but was absorbed by Blue Cross/Blue Shield during the period of time that Skodnek engaged in his criminal scheme); count 135 charged Skodnek with obstruction of justice; and count 136 charged him with witness intimidation.

Throughout this Memorandum, all references to the counts with which Skodnek was charged and of which he was convicted refer to the counts as enumerated in the superseding indictment.

Skodnek's criminal conduct began on or about August 31, 1992 and extended to March 31, 1994; the amount of wrongful billing during that time totalled $157,460.

On August 2, 1995, after a trial of 15 days, the defendant was convicted on all counts contained in the superseding indictment.

Sentencing took place over two days.

The government sought a sentence of 80 months. The government's position was based on the following: 1) a total offense level of 25, driven by the government's suggested loss figure of $1,218,454.50 million, up from the $157,460 which was the subject of the superseding indictment; 2) a number of offense-related adjustments; 3) a request for an upward departure; 4) supervised release of three years; 5) special assessments totalling $6,800; 6) an order of restitution totalling $652,125.39; and 7) a substantial fine. The defendant disagreed with the government's loss calculation and the offense related adjustments; he also pressed for a downward departure.

Both the government and the defendant vigorously argued for their respective positions. Adding to the voluminous trial record, the defendant presented materials by way of affidavit and brief. The defendant was given an opportunity to present testimony and did so.

My sentencing decision was based on the evidence presented during the trial as well as the evidence, including the exhibits and affidavits, submitted during the sentencing hearings.

A few preliminary thoughts: Prior to the Federal Sentencing Guidelines, a judge could have taken the position that eighty months is a substantial sentence for a defendant like Dr. Skodnek. He is, after all, a first offender, much of whose life had been spent caring for patients as a psychiatrist. He is charged with a non-violent crime. In days past, this Court would have been able to focus solely on Skodnek as an individual offender. This judge could have decided that for this defendant, whose career as a psychiatrist had been ruined, walking into a penal institution for the first time, hearing the doors clank shut behind him, would be devastating, and further, that it did not take nearly seven years of taxpayers' money to effect his rehabilitation or to deter others from the sort of misconduct of which Skodnek was convicted.

However, these are not pre-Guidelines days.[2] As others have noted, the Sentencing Guidelines have changed sentencing in fundamental ways. The methodology required of courts has changed, compelling judges to examine their sentencing decisions in greater and greater detail, requiring more documentation, and exposing the results to more rigorous appellate review.

The project itself has been transformed. In order to homogenize sentencing, courts are obliged to apply rigid categories to what is or should be an individualized decision, rather than to exercise broad discretion and judgment.[3] Indeed, treatment of crimes within each category has changed: White collar crime, in particular, is treated more seriously than ever before, with the amount of monetary loss to the victim largely driving the determination of the defendant's sentence. The more substantial the loss, the greater likelihood of a substantial sentence.

Even the goals have shifted. While the statute setting forth the duties of the Federal Sentencing Commission and enabling the creation of the Guidelines still acknowledges rehabilitation as a goal, that purpose itself may not dictate an individual sentencing decision.[4] Under the Guidelines, a sentencing

---

2. The Sentencing Reform Act of 1984 charged a Federal Sentencing Commission with promulgating guidelines which, among other things, would establish presumptive sentencing ranges for specifically defined categories of defendants and offenses. *See* 18 U.S.C. §§ 3551; 3553(a)(4); 28 U.S.C. § 991–998 (as amended); *see also, e.g., Williams v. United States*, 503 U.S. 193, 195–196, 112 S.Ct. 1112, 1116–17, 117 L.Ed.2d 341 (1992).

3. *See, e.g.,* S.Rep. No. 225, 98th Cong., 2d Sess. 38, 51, 161 (1984), U.S.Code Cong. & Admin.News 1984, p. 3182; 18 U.S.C. § 3553(a), (b).

4. *See, e.g.,* 28 U.S.C. §§ 991(b)(1); 994(k); 18 U.S.C. § 3553(a)(2). In Section 994(k), Congress directed: "The Commission shall insure that the guidelines reflect the inappropriateness of imposing a sentence to a term of imprisonment for the purpose of rehabilitating the defendant or pro-

judge may not titrate a sentence to fit an individual. A judge may not ask how much time is really necessary to effect the goals of sentencing; he or she may not consider what kinds of societal resources really need to be brought to bear to stop this individual and others like him. While in limited circumstances, a court may depart from the Guidelines' categories, at the end of the day, for an individual defendant, the result at sentencing is largely pre-ordained by the Guidelines' rigid framework.

It is within this framework that I am obliged to view defendant Skodnek and his crimes.

## II. LOSS CALCULATIONS

### A. Framework

#### 1. Relevant Conduct

In cases involving fraud, the Guidelines direct courts to determine the monetary loss caused to the victim by the defendant's criminal conduct, under a theory that the amount of loss generally serves as an appropriate proxy for the gravity of a defendant's offense, see U.S.S.G. § 2F1.1(a); *United States v. Rostoff*, 53 F.3d 398, 405 (1st Cir.1995). Determination of the appropriate loss amount, therefore, plays a critical role in deciding the severity of a defendant's sentence.

In the instant case, the government urges me to consider evidence of misconduct resulting in losses greatly in excess of the amount with which the defendant was charged and of which he was convicted.

■ It is beyond dispute that the Guidelines generally oblige me to consider uncharged but relevant conduct, and the losses resulting from such conduct, in making my sentencing determination. *See* U.S.S.G. § 1B1.3 (defining relevant conduct); U.S.S.G. § 2F1.1 (calculation of loss);[5] *see also Rostoff*, 53 F.3d at 406; *United States v. Bennett*, 37 F.3d 687, 694 (1st Cir.1994).

■ It is also beyond dispute that care should be exercised when using such evidence. I must determine that the evidence offered is reliable and proved, at minimum, by a preponderance of the evidence.[6] The reason for these precautions is clear: While it was commonplace to consider such evidence pre-Guidelines, the power and effect of loss evidence not presented at trial have been magnified under the Guidelines. In the past, a prosecutor might call for harsher sentencing by suggesting generally that the defendant's trial conduct was but the "tip of the iceberg." That sort of argument may have made a difference on the margins of a defendant's sentence. Now, a prosecutor may dramatically alter a defendant's term simply by proving, more probably than not, that a particular loss figure was involved.

In so doing, prosecutors may wrest considerable discretion from the trial court. For,

viding the defendant with needed educational or vocational training, medical care, or other correctional treatment."

5. The relevant conduct guideline provides, with respect to criminal activity undertaken by a defendant individually that:
    Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level; (ii) specific offense characteristics; (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:
    (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant
    U.S.S.G. § 1B1.3(a)(1).

6. The standards for the admissibility and consideration of evidence at sentencing are substantially less formidable, from the government's per-

spective, than the standards applicable at trial. It is well settled that due process does not require that a defendant, once convicted, be sentenced only based on facts proved beyond a reasonable doubt. *United States v. Lindia*, 82 F.3d 1154, 1160 (1st Cir.1996). Accordingly, where the government seeks to include uncharged conduct, it must simply prove a sufficient nexus between the extraneous conduct and the offense of conviction—generally by a preponderance of the evidence. *E.g., United States v. Williams*, 10 F.3d 910, 913 (1st Cir.1993); *United States v. Lowden*, 955 F.2d 128, 130 (1st Cir.1992); *see also McMillan v. Pennsylvania*, 477 U.S. 79, 91–93, 106 S.Ct. 2411, 2418–20, 91 L.Ed.2d 67 (1986). In addition, the rules of evidence need not apply; the sentencing courts may consider hearsay, so long as the court is satisfied that it has other adequate indicia of reliability. *E.g., U.S.S.G. § 6A1.3(a); United States v. Valencia–Lucena*, 988 F.2d 228, 232 (1st Cir.1993).

even in making charging decisions, prosecutors may decide what claims to expose to the most strenuous trial standard, beyond a reasonable doubt, and what claims to expose to the most minimal standard, more probable than not, what allegations to test by the standards required by the Bill of Rights, and what allegations to expose to less searching review.

Unmonitored, the process of determining loss for sentencing purposes by projecting probable loss from identified loss could lead to an inappropriate result: the sentencing "tail" could easily end up wagging the trial "dog."[7] Convicted beyond a reasonable doubt of an offense involving a small amount of loss to a victim, a defendant may be at risk of being sentenced for a substantially larger amount, and this time based only on a reasonable estimate, no matter what the good faith assumptions are and no matter how well tutored.

Consider this case. The superseding indictment charged Skodnek with misconduct resulting in a loss of $157,460. The government now asks me to sentence defendant Skodnek based on a loss figure of $1,218,-454.50. The government explains that the loss projections are based on a number of factors. First, the government points to the testimony of additional witnesses, not presented at trial, whose interviews apparently prove greater losses from fraud than was contemplated in the superseding indictment. Second, it arrives at this figure by "extrapolating" from the universe of known losses (either proved at trial, or based on actual witnesses and records obtained post-trial), to a figure which the government today contends is the "real" loss figure.

Given the stakes involved, and mindful that defendants should be given an adequate and full "opportunity to present relevant information" at sentencing, U.S.S.G. § 6A1.3(a); *United States v. Regan*, 989 F.2d 44, 45 (1st Cir.1993), I have taken a number of steps to arrive at the loss amount. *See United States v. Martinez*, 83 F.3d 488, 494 (1st Cir.1996).[8] First, I ensured that the defendant had full notice of the government's position, not only as to ultimate conclusions, but also as to methodology and underlying data.[9] Second, I allowed extensive briefing and testimony with respect to the loss figures proposed by

---

7. As one commentator put it:

The system that has evolved in federal court thus accords elaborate procedural protection during first round decisions on which ten months of an individual's freedom may depend, and few and sporadic protections to similar, final decisions, on which twenty-nine or more years of freedom may depend—simply because one decision has been allocated to a proceeding called a trial and the other to a proceeding called a sentencing. This system also imposes strict procedural obligations on prosecutors who wish to charge a defendant with a particular crime, but then provides them with a shortcut alternative means of having a defendant punished for an additional offense that they might not have been able to prove beyond a reasonable doubt, so long as the defendant has been convicted of a related offense.

Herman, The Tail that Wagged the Dog: Bifurcated Fact–Finding Under the Federal Sentencing Guidelines and the Limits of Due Process, 66 S.Cal.L.Rev. 289, 291 (1992); *see also McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) (observing that in limited circumstances, the evidence presented for the first time at sentencing may be "a tail which wags the dog of the substantive offense," thereby requiring a higher burden of proof than by the preponderance of the evidence); *United States v. Lindia*, 82

F.3d 1154, 1161 n. 6 (1st Cir.1996) (noting case law suggesting a concern about substantially increasing a sentence based on evidence not presented at trial).

Indeed, several courts have acknowledged that due process concerns may require that a higher standard of proof be applied where the allegedly relevant conduct would substantially enhance a defendant's sentence. *See, e.g., United States v. Restrepo*, 946 F.2d 654, 661 (9th Cir.1991) (Trang, J., concurring); *United States v. Townley*, 929 F.2d 365, 370 (8th Cir.1991); *United States v. Kikumura*, 918 F.2d 1084, 1101 (3d Cir.1990).

8. In *Martinez*, the First Circuit emphasized the importance of holding an evidentiary hearing where evidence involved "high stakes," that is, where disputed facts, "provided the crucial evidence of the amount of drugs that could be attributed to [the defendant]; and as much as four years in prison were riding on the issue." *Id.*

9. The defendant received all of the data relied upon by the government in determining the loss calculations. In its Supplemental Memorandum Re: Calculation of Loss and Relevant Conduct, the government also provided the defendant with the methodology used to calculate the loss figure for which it pressed.

the government, particularly as to the loss amounts arrived at through extrapolation.

I tested the information to ensure its reliability. *See United States v. Sklar,* 920 F.2d 107, 113–114 (1st Cir.1990). For although the Guidelines indicate that my finding of loss need not be based on uncontested facts or determined with detailed accuracy,[10] they do oblige me to test the information so that I am satisfied that the evidence has "sufficient indicia of reliability to support its probable accuracy," *see* U.S.S.G. § 6A1.3, that is, "sufficiently dependable to be used in imposing a sentence." *United States v. Tardiff,* 969 F.2d 1283, 1287 (1st Cir.1992).[11]

### 2. *Fraud Guidelines*

The Guidelines' rigid categories express themselves in a grid that serves as a sort of mathematical worksheet to be used by judges to determine an individual defendant's sentence. The starting point for crimes involving fraud is a base offense level of six. *See* U.S.S.G. § 2F1.1(a). This offense level increases in steps, proportionate to the magnitude of the monetary loss of the victim, if that loss exceeded $2,000. *See* U.S.S.G. § 2F1.1(b)(1).

In this case, a critical question is whether the amount of loss associated with this defendant's conduct is more than $350,000, $500,-000, or $800,000, *see* U.S.S.G. §§ 2F1.1(b)(1)(J); 2F1.1(b)(1)(K), and 2F1.1(b)(1)(L), since at each level, there is a one point increase (from an increase of 9 levels, for loss of $350,000 to an increase of 11 levels of loss of more than $800,000) in the base offense level.

---

10. The Guidelines provide:
    [T]he loss need not be determined with precision. The court need only make a reasonable estimate of the loss given the available information. This estimate, for example, may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenue generated by similar operations. The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss.
    U.S.S.G. § 2F1.1, Comment (n. 8); *see also United States v. Kelley,* 76 F.3d 436 (1st Cir.1996).

11. In *Tardiff,* the defendant was convicted of mail fraud. The sentencing court arrived at the

### B. *Application*

#### 1. *Evidence of Loss*

I will proceed by first evaluating the evidence, as presented, along a continuum—from that which is clearly reliable to that which is less so—to determine the point along that continuum, if one exists, at which the data "is not sufficiently dependable to be used in imposing a sentence." *Tardiff,* 969 F.2d at 1287.

The evidence provided to support the government's theory of loss may be divided usefully into three categories: First, there is a core of misconduct alleged in the indictment and proved by the government beyond a reasonable doubt (category i). Second, there is misconduct based on witness statements and documents which were not included in the indictment or proven at trial (category ii). And third, there is misconduct (category iii) that the government seeks to prove by extrapolating from the known trial losses in category (i) and the known losses in category (ii).

For the reasons outlined below, I find that categories (i) and (ii) are sufficiently dependable to form the basis for this sentencing decision. Category (iii) plainly is not. While the government invites this Court to extrapolate from the known losses in ways not supported by statistical theory, to cover a period outside that covered by the superseding indictment, based on flawed assumptions inadequately grounded in the trial evidence or sentencing data, I decline to do so.

#### a. *Category (i): Losses Proved at Trial*

■ The government's case at trial demonstrated that the defendant perpetrated total amount of loss through a series of victim impact statements. The First Circuit upheld both the amount arrived at and the methodology, reasoning that the statements were sworn to by affected investors and that they were "the type and kind of evidence on which sentencing courts have commonly relied." *Tardiff,* 969 F.2d at 1287. The court also noted the statements did not lack traditional indicia of reliability, and that the affiants apparently had "personal knowledge of the matters contained in the statements. We conclude, therefore, that the victim impact statements comprised competent proof at sentencing and were properly treated ... as reliable." *Tardiff,* 969 F.2d at 1287–1288.

fraud through a number of schemes, resulting in loss to the victim insurance carriers, BCBSMA, Medex, BSHC as well as the Medicare program. Skodnek was shown to have "upcoded" his billings, that is, he charged the insurance carriers for longer sessions than, in fact, were held.[12] Second, he engaged in a practice known as "retracting," charging for services never rendered. At trial, the government demonstrated the existence of this scheme by showing that Skodnek charged for sessions included within periods of time when he was on vacation or out of the state. Third, Skodnek engaged in a practice known as "looping," charging for treatment of individuals whom he had never seen as patients, namely the spouses and children of Skodnek patients.[13] From these three schemes, the government at trial proved loss to the victim insurance carriers in the amount of $157,460.

### b. *Category (ii): The Additional Confirmed Losses*

█ The loss amount suggested by the government for sentencing purposes includes loss not proved at trial. Post-trial, the government interviewed individuals, who were not named in the indictment and reviewed additional documents. Some of these interviews and documents supported the view that Skodnek engaged in the sorts of fraudulent practices detailed at trial with respect to the other patients as well, and particularly with respect to certain individuals identified through a detailed interviewing process.

If I find that the government has, through reliable data, proved by a preponderance of the evidence that Skodnek's fraudulent activities extended to overbilling related to these interviewees, I am obliged to add the evidence in this category to the amount of loss established at trial. I so find.

Adding together the loss to the victims from categories (i) and (ii), except for TAHP, totals $358,681.64. The total for TAHP is somewhat more complicated. TAHP took the known losses in the time period alleged in the indictment, and extrapolated them to a ten year period from January 1, 1985 until May 15, 1995. In effect, then, the TAHP totals comprise both categories (i), the indictment losses, and (ii), losses gleaned from post-trial documents and interviews, as well as extrapolated figures in category (iii).

I will address the legitimacy of the extrapolated figure below. At this point, since the TAHP losses limited to the relevant time period without extrapolation are $74,000, the total for all insurance carriers and Medicare is $432,681.

### c. *Category (iii): Extrapolated Losses*

The government's extrapolation analysis works generally from the known losses to unknown losses based on process of assuming a certain rate of fraudulent billing. Particularly, the government begins its extrapolation by figuring the rate of the upcoding of Skodnek's therapy sessions (exaggerating the length of the session from thirty minutes to 60 or 90 minutes) in the known sample of the defendant's billings. It then assumes that rate of fraud to have existed—in a consistent manner—throughout the total universe of Skodnek's billings, during a period extending three years before the period covered in the superseding indictment to one year after that period, that is, from January of 1989 through December of 1994. The government argues that this procedure is appropriate because its investigation of Skodnek's billing in post-trial interviews and surveys by the providers suggests: that the pattern of fraud existed throughout the universe of Skodnek's billings; and that no per-

---

12. Specifically, evidence was presented that the defendant billed for thirty minute sessions as sixty or ninety minute sessions. This practice was reflected in the coding of the sessions. Skodnek would bill as 90 minute family therapy (Code 90833) or as 50 minute individual psychotherapy (Code 90844) sessions that were, it was alleged, only 30 minutes long (Code 90843).

13. "Looping" is apparently engaged in to get around a given patient's maximum benefits and often involves billing in the name of one patient's family member until his or her benefits run out and then moving on to the next family member to maximize the amount paid per family per calendar year.

son interviewed could verify the accuracy of Skodnek's billings in their names.[14]

Thus, to the "verified losses," which are, with certain exceptions,[15] analogous to my categories (i) and (ii), the government would add the extrapolated $308,699.27 downcoding amount, for a total of $792,380.91.[16]

The government argues that this Court adopt this methodology and this figure, suggesting, among other things, that it is conservative. The figure, the government notes, does not take into account the likely misbilling resulting from the other fraudulent practices like looping or from billing for sessions scheduled during Skodnek's vacation beyond the universe of confirmed losses.[17] It does not take into account the $157,660.00 administrative expenses directly related to the investigation of Skodnek's fraud by BCBSMA and Medicare.[18]

When the government adds what it describes as the "retraction" rate (services billed but not provided), derived from the known universe of Skodnek billings, to the entire universe of Skodnek's billings, the amount exceeds 1.2 million. Accordingly, the government suggests that, at the very minimum, the losses attributable to Skodnek's criminal conduct under U.S.S.G. § 2F1.1 exceeds the guideline category of $800,000.

## 2. Methodology: Extrapolation

As I have indicated above, as general matter, courts may extrapolate for sentencing purposes, including where the calculation is for the purpose of determining loss attributable to a defendant's fraud. See U.S.S.G. § 2F1.1, comment (n. 8). Statistical precision is not required.[19]

However, while the case law permits the approach in general, it plainly counsels caution. See, e.g., Rostoff, 53 F.3d at 407–408 (bank fraud); United States v. McAlpine, 32 F.3d 484 (10th Cir.), cert. denied, —— U.S. ——, 115 S.Ct. 610, 130 L.Ed.2d 520 (1994) (mail fraud); United States v. Sutton, 13 F.3d 595 (2d Cir.1994) (bribery); see also

14. The defendant disputes the objectivity of the investigation, claiming that not only did some of the individuals interviewed dispute the government's contentions, but the investigative process itself wholly failed any objective measure, since the responses from those individuals were not accounted for in the creation of the "random sample."

15. The government includes in the verified loss category the amount of money which Skodnek paid in settlement of the TAHP claim, or $125,000. As described above, I have culled from the TAHP amount only those losses that were in fact verified by actual interviews with clients during the relevant time period, and not those losses projected over a period beyond that covered by the superseding indictment.

16. In its briefing, although not as readily at the sentencing hearing, the government did not acknowledge that this number represents an extrapolation: it considered the downcoding of the universe of Skodnek billing as to the length of services part of the "Confirmed Losses."

17. The government cites to trial testimony from which summarized the average weekly hours Skodnek billed to BCBSMA, BSHC, MEDICARE and Medicaid for 1990 through 1993, namely, from a low of 66.35 to a high of 140.10, and compared those hours to the representations Skodnek made concerning his average hours in credential applications submitted to BSHC in 1989 and 1992. He listed as his average hours on these applications 50 to 55.5 hours. The government contends that the discrepancy sug-

gests consistent overpayments. The government also cites to trial testimony indicating that Skodnek billed for every Saturday for an average of 15.43 hours, despite his representations—credential application, Tufts Audit report, BSHC practice survey—that he conducted no weekend hours.

In rebuttal, Skodnek suggests that the representations he made in credential applications were not made to suggest the real limitations to his work hours, but rather simply to discourage week-end referrals. Moreover, he notes that these applications represented generalized descriptions of his practice, not taken under oath.

18. The government concedes in its Supplemental Memorandum Re: Calculation of Loss and Relevant Conduct that there is no authority in the Sentencing Guidelines or the current caselaw to include these consequential damages in its calculations.

19. The First Circuit has noted that extrapolation is acceptable and that the amounts need not reflect "statistically or scientific precision." United States v. Scalia, 993 F.2d 984, 989 (1st Cir.1993). The Scalia court also noted that "courts have endorsed statistically based drug-quantity extrapolations predicated on random test samples in circumstances where the government was able to demonstrate an 'adequate basis in fact for the extrapolation and that the quantity was determined in a manner consistent with the accepted standards of [reasonable] reliability.'" Id. [citations omitted].

*United States v. Lindia,* 82 F.3d 1154, 1161 n. 6 (1st Cir.1996) .(drug offenses); *United States v. McCutchen,* 992 F.2d 22, 24–26 (3d Cir.1992) (same); *United States v. Uwaeme,* 975 F.2d 1016, 1019 (4th Cir.1992) (same); *United States v. Sklar,* 920 F.2d 107, 113–114 (1st Cir.1990) (same).

For example in cases involving drug quantities, extrapolation typically involves generalizing corroborated evidence in one period to the whole time frame of the illegal activity, essentially "filling in gaps" with evidence of identical behavior, packaging, consistent statements of participants, and so forth. However, even here, the process of "filling in gaps" must be used cautiously and not assume too much. In *Sklar,* for instance, the defendant had been arrested and 75 grams of cocaine seized; he was subsequently convicted. At sentencing, the government sought to include as relevant conduct uncharged conduct in the form of cocaine delivered to the defendant, all inscribed in what appeared to be the same handwriting and bearing a series of apparently fictitious trade names signifying the originators of the packages. The district court took into account the evidence of these uncharged cocaine deliveries, inferring that the periodic mailings to the defendant from a "fictitious entity at a series of fictitious addresses were of the same ilk as the package actually intercepted." *Sklar,* 920 F.2d 107, 109 (1st Cir.1990).

On appeal, the First Circuit considered whether the sentencing court's calculation was too speculative and called the question "close." It concluded that the district court's decision was not clearly erroneous, that the concrete data strongly suggested that the uncharged deliveries were each part of the same scheme. And, while supporting the district court's conclusion, the First Circuit sounded a strong note of caution, directing sentencing courts, because of the impact of quantity on the length of a sentence, to "err on the side of caution," *Sklar,* 920 F.2d at 113, when resolving doubts about figures based on extrapolation. *Accord United States v. Whiting,* 28 F.3d 1296, 1304 (1st Cir.1994).[20]

Moreover, determining losses stemming from fraud may involve considerably more complex issues than deciding drug quantities. Often, as here, the activity in question involves legitimate as well as possibly illegitimate transactions. It may well be that not every bank loan involved fraud, not every billing involved deceit. Indeed, courts have been mindful of the need to assure that the legitimate is adequately distinguished from the criminal when extrapolated losses have been urged upon them. For instance, in *Rostoff, supra,* the District Court, per Judge Zobel, considered the appropriate amount of loss after a defendant had been convicted of bank fraud. At sentencing, the court computed the amount of loss based on the loans specifically enumerated in the substantive counts of the indictment, plus additional loans that federal agents had identified as fraudulent. The court declined to extrapolate further. Its methodology was accepted

---

**20.** A look at *Whiting* is instructive. It provides, perhaps, a best case for the government. And it does not stretch as far as the government proposes in the case before me. In *Whiting,* the First Circuit reviewed a sentencing court's estimate that the defendants were involved with the distribution of about two kilograms of cocaine per week over a period of three years. The defendants challenged the sentence calculation, arguing that it was "inherently speculative ... to derive from [the] evidence estimates of the total amount of cocaine handled by the conspiracy over its three-year period." *Id.*

The First Circuit disagreed with the defendants. The Court's reasoning, however, did not amount to a license to engage in easy speculation about the universe of loss (or drug amounts) caused by a defendant's misconduct. To the contrary, the Court carefully listed factors which corroborated the sentencing court's determination: the estimate was based chiefly on general comments made by various defendants regarding their average volume of drug business; and these comments were corroborated by reports from cooperating co-defendants, with respect to particular quantities on specific dates, from controlled buys by government agents and evidence of the size and scope of the drug organization itself. *Id.* at 1304–1305. Indeed, the Court sounded a note of caution: "We agree that special care may be needed where evidence of quantities in one period is extrapolated to fill gaps in evidence as to other periods." *Id.* at 1305.

by the First Circuit on appeal. *Rostoff,* 53 F.3d at 407–408.[21]

■ Applying this cautious approach, I conclude that the category (iii) extrapolation was not sufficiently reliable on which to base a sentencing decision. In order to accept the picture offered by the government with respect to the entire universe of fraudulent billings, I have to accept that Skodnek almost never honestly billed a single patient, never forgot to bill for time he had actually spent with them (and thus underestimated his work), that his illegal activities never ebbed and flowed over a five or six year period.

The trial testimony and the documentary evidence simply do not bear out these assumptions, and I cannot accept them even by a "preponderance of the evidence" standard. There were witnesses who testified to Skodnek's dedication as a doctor, his willingness to speak with them on the phone day or night, to see them at a moment's notice. This testimony suggests hours—perhaps unbilled—that Skodnek may well have put in on behalf of clients. Moreover, during the period in question, there were audits of his billing practices by the various insurers, which though they resulted in reductions in Skodnek's bills, never triggered the kind of fundamental concerns raised by this proceeding. If the fraudulent practices were as pervasive as the government contends and Skodnek's billing practices so wholly without integrity, one would have expected their discovery during these periods. The issue is not merely whether this Court believes it more probable than not that Skodnek engaged in fraudulent practices resulting in losses beyond what is covered in the confirmed loss category. The issue is whether this Court has been presented with sufficiently reliable data upon which

to gauge the extrapolated loss amount. The Guidelines require this degree of care.

In addition, the extrapolation was not done according to the usual statistical formalities. While the absence of such formalities is not dispositive under the Guidelines, it has significance in this case. Statistical protocols represent standards for determining whether and under what circumstances it is reasonable to extrapolate from a known universe to an unknown one. *See* Kaye & Freedman, Reference Guide on Statistics, FEDERAL JUDICIAL CENTER'S REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 332 (1994). They draw on probability theory to determine whether the observed variations likely depend upon chance, or whether they likely represent a pattern of intentional conduct. Put otherwise, they represent a more formal way of determining the issues which are involved in this very sentencing hearing: What reasonable inferences can be drawn from the evidence; with what degree of certainty can we draw those inferences?

What is "reasonable" for statisticians in the business of extrapolation should be presumptively reasonable for this Court in evaluating the government's proposed extrapolation under the preponderance standard. To the extent that the government departs from that standard, it should bear the burden of justifying that departure and establishing the reliability of the means it has selected. It cannot do so.

The data on which the government relies is skewed. With the sole exception of the TAHP figures, the government did not begin with a random sample. Instead it was a convenience sample,[22] garnered by a unit whose purpose is to investigate fraud. It

---

21. The First Circuit noted that the trial judge had relied on the FBI agent's affidavit attesting to the fact that he had reviewed bank documents and found, as to each one of the additional loans, " 'specific evidence of fraud,' " *id.,* when determining that evidence of these loans had sufficient indicia of reliability to be considered at sentencing. In contrast, the court excluded loans for which the defendant had been acquitted and also *declined to extend losses to other loans where, as* the First Circuit commented in accepting the trial judge's practice, "the record contains only sketchy information about the origins and extent of losses." *Id.* at 407.

22. A convenience sample is one framed not by random sampling techniques but by some other criterion—surveys of shoppers in a given mall seeking to draw inferences to all shoppers in the area, listeners to radio talk shows, constituents who write to their congressmen, interest groups collecting information from their members. As Kaye and Freedman suggest, such samples may be biased by the interviewer's discretion in deciding whom to interview and the refusal of some of those approached to participate. *Id.* at 344.

was conducted not by dispassionate interviewers, but by fraud and abuse investigators, including some from the FBI, the Office of the Inspector General, and the Medicare Abuse Unit. Clearly, the interviewers were searching out "horror" stories, the stuff of which criminal prosecutions can be made or sentencing increased. Indeed, there were instances in which reports apparently inconsistent with the overall conclusions were ignored.[23] In this regard, I credit the affidavit of Professor Alan Zaslavsky, an Associate Professor in the Department of Statistics, Harvard University, who noted:

> In other words, the contradictory evidence from these patients was used only to modify their own loss estimates and was not included in calculation for the projections. This practice of ignoring cases which deviate from an expected norm is entirely in contradiction to the rationale for random sampling as a method of objectively choosing a sample that is representative of the population.

The difficulties in surveying this population are exacerbated by the passage of time, since the surveyors asked people about the pattern of their visits to Dr. Skodnek some seven years ago, in some cases. It would be difficult enough in 1996 to recall sessions with Dr. Skodnek between 1991 and 1993. It would be extraordinary to recall sessions from 1989 or thereabouts. Some of the individuals interviewed had no calendar and spoke generally, noting that they saw Dr. Skodnek "often," that it was not unusual to see him on a weekend or a holiday, and so forth.

I am also persuaded by the fact that, in this case, unlike drug cases, it was available to the government to conduct these surveys using the appropriate statistical formalities. TAHP did, to a point. Tufts used probability sampling in determining the group to be studied.[24] The defendant agrees that the Tufts survey supports an inference regarding the percentage of claims overbilled during the covered periods. The problem with the Tufts approach is that it extrapolated outside of the indictment period without basis.[25]

Thus I conclude that the losses that fit the test of reliability are those defined by category (i) and category (ii) or, $358,681.84, and I reject the category (iii) extrapolated losses. Accordingly, I find losses of more than $350,000 but less than $500,000 within 2F1.1(b)(1)(J). To the base offense level of 6, I am obliged by the amount of loss to add 9.

23. The largest component of the extrapolated loss derived from downcoding from 60 or 90 minute sessions to 30 minute sessions, on the assumption that absolutely all the longer sessions were overbilled. (At the same time, the BCBSMA executive summary notes that "one patient indicated that he saw RS for 50 minutes"). The note indicates that no downcoding was done for that individual patient, suggesting that some care was taken to be precise in the confirmed loss category (category ii). The note nevertheless raises concerns about extrapolation and problems with the initial sampling techniques; the impact that this patient would have on the figure estimating the proportion of claims that were overbilled, the possibility that other patients would have suggested that Dr. Skodnek spent more than thirty minutes with them, how many can even remember what time they spent years after the fact. If I am to extrapolate to a given figure, and if that figure is to have the significance that the Guidelines give it in determining this sentence, then I would need more indicia of reliability even to meet the preponderance standard. Likewise, in the BSHC executive summary, it is written that there were "three patients" who did not fit the overall pattern, who remembered seeing Skodnek for sixty minutes.

24. For the Tufts population a sample of 30 patients is drawn randomly out of the 112 patients seen during the period of 1/1/91 to 11/30/93.

25. The deficiency of the Tufts approach as noted above was that it extrapolated outside of the indictment period without basis. To quote Dr. Zaslavsky:

> While the apparently valid Tufts survey supports an inference regarding billings within the study period, that survey cannot support an inference outside the population from which the billings were sampled. There is no statistical basis for any conclusion that the rate of false billing is constant over a longer time period. The Tufts study does not even attempt to demonstrate that this rate was constant over the study period. Even if isolated cases of fraud can be demonstrated outside the study period, that would not show that the rate was the same in those other periods. Projection to the distinct population of billings from another period, whether the preceding three years or the preceding twenty years, is merely conjectural.

## III. VICTIM AND OFFENSE RELATED ADJUSTMENTS

The government has sought, and I have granted, a number of adjustments based on Dr. Skodnek's role in the offense and the status of the victims.

### A. More than Minimal Planning

I have granted a two level adjustment under U.S.S.G. § 2F1.1(b)(2) because the offense involved 1) more than minimal planning and 2) a scheme to defraud more than one victim.

### B. Victim Related Adjustment

The victim-based adjustments are somewhat more complicated because there are two categories of victims, the identified victims, the private insurance carriers and Medicare, whose loss the Guidelines direct me to consider when determining the base offense level, U.S.S.G. § 2F1.1, as well as the incidental victims, whose lives were affected by the defendant's fraud: in this case, the patients.

As to one of those patients, the government asks for a two level enhancement under U.S.S.G. § 3A1.1(b) because of the vulnerability of one of the victims, who was targeted in the obstruction of justice count.[26] *See* Presentence Report, par. 38–42.

I agree and grant the enhancement.

As for the other victims, their hardship will be considered below.

### C. Abuse of Trust

■ In addition, the government seeks a two level enhancement under U.S.S.G. § 3B1.3 because the defendant abused his position of trust with respect to the insurance companies in the commission and concealment of the offense.[27] Billing systems depend upon trust, and he plainly took advantage of whatever honor system exists in the systems currently used for professional billings directed to insurance carriers for reimbursement.

Accordingly, I will grant this two level enhancement.

### D. Obstruction of Justice

The government also seeks a two level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice, to which it is entitled. The defendant was convicted of obstruction of justice in Count 135, relating to his efforts obstruct the grand jury investigation.

### E. Summary

Based on the foregoing, my calculations at this point are as follows:

| | |
|---|---|
| Base offense level | 6 |
| Loss calculation | + 9 |
| More than minimal planning | + 2 |
| Abuse of trust | + 2 |
| Vulnerable victim | + 2 |
| Obstruction of Justice | + 2 |
| TOTAL | 23 [28] |

## IV. DEPARTURES

■ I have said that the Guidelines oblige me to consider this case within its rigid framework and that my discretion is effectively restricted by those confines. If, however, I were to find that the situation presented in this case—overall—is not an ordinary one, I may depart from the range required by the Guidelines. *United States v. Rivera*, 994 F.2d 942, 946 (1st Cir.1993). As the Guidelines' Policy Statement on grounds for departure notes: "[C]ircumstances that may warrant departure from the guidelines ... cannot, by their very nature, be comprehensively listed and analyzed in advance." U.S.S.G. § 5K2.0. The First Circuit, given this understanding, has stressed that the rule is one of reasonableness, and that "[w]hen such unforeseen circumstances arise, the district court will decide whether to depart (and, if so, how much to depart) by examining the unusual nature of these circumstances and making a

---

26. The government seeks to have this Court take into account the impact on the other patients through their upward departure request.

27. Again, to the extent that the patients' harm derived from Skodnek's abuse of their trust, it addressed in the government's motion to an upward departure.

28. *The defendant has no prior record. His criminal history category is I.*

judgment about what is appropriate." *Rivera*, 994 F.2d at 949.

In this case, both the government and the defendant seek departure with respect to the term of Skodnek's sentence. Based on a detailed consideration of their respective requests, I find that the vectors cut in both directions, suggesting that an upward departure may be warranted, as may be a downward departure. Where there are grounds for cross-cutting departures, a district court judge may well end up, ultimately, back in the heartland. *United States v. Harotunian*, 920 F.2d 1040 (1st Cir.1990).[29]

As I set forth below, I find that while there are bases for departing both upward and downward, it would be inappropriate to veer in either direction. Accordingly, no departure as to the term of Skodnek's sentence is warranted.

### A. *Upward Departure*

The government seeks to go further than the above listed adjustments to the offense level. They seek departure under Section 5K2.0, on general departure grounds, argu-

ing that Skodnek abused the trust of his patients, the so-called "incidental victims" of the scheme. As a general matter, departure may be warranted where the harm done to the victim is the sort of harm that ordinarily results from the type of crime involved. In addition, I am to examine whether departure is required or whether the concerns with respect to the harm to these victims have been adequately addressed within the Guidelines. *Rivera*, 994 F.2d at 946.

The Guidelines thus far have offered no opportunity to calibrate the harm Skodnek's fraud caused his patients. The "vulnerable victim" adjustment within the Guidelines, as I discussed above, pertains only to one patient, who was targeted by Skodnek in his efforts to thwart the criminal investigation into his activities. As for the harm done not to Skodnek's other patients, the government maintains, and I agree, that the existing Guidelines categories do not adequately take their suffering and loss into account.[30]

I believe an upward departure could be warranted not because of the psychological harm to the patients, about which there is

---

29. In *Harotunian*, where the defendant sought a downward departure because of his gambling addiction and duress from coercive bookmakers and the government sought upward because the amount of the embezzled funds exceeded the value in the applicable guideline, the First Circuit sustained the district court in assessing countervailing adjustments in the interim guidelines, to ultimately arrive at a net figure. *Id.* at 1044.

30. The government has withdrawn its request for an upward departure under §§ 5K2.3 and 2F1.1 (n. 10) because of *United States v. Pelkey*, 29 F.3d 11 (1st Cir.1994) aff'd after remand, *United States v. Pelkey II*, 57 F.3d 1061 (1st Cir.1995). In *Pelkey I* the First Circuit reviewed the trial court's decision to grant an upward departure in a case where a real estate broker and financial advisor was convicted of defrauding friends, business associates and former customers, based on U.S.S.G. §§ 2F1.1 (n. 10) and 5K2.3. The Court remanded for further hearing on the issue of whether the evidence warranted upward departure under § 2F1.1, (n. 10) (for financial strain), where there were no specific findings of unusual hardship as a result of the fraud; however, it flatly disallowed the departure under § 5K2.3 for extreme psychological harm, *Pelkey I*, 29 F.3d at 15. The *Pelkey I* Court held that the record below simply did not support a finding of extreme psychological harm.

As the First Circuit has explained in its *Pelkey* decisions, section 2F1.1, note 10 applies to situations in which the loss in quantitative terms does not fully capture the harmfulness and seriousness of the offense, including instances in which the offense caused reasonably foreseeable psychological of physical harm or severe emotional trauma. In light of *Pelkey I*, the government is quite right to be concerned about whether or not a court may base a determination as to extreme psychological harm on a record that contains little direct information on this point.

That stated, I need not address these issues in this case, because I conclude that there could be a sufficient basis for an upward departure stemming from the profound abuse of trust issues with respect to Skodnek's patients.

I should note, however, that the adjustment for a vulnerable victim under § 3A1.1 may not raise the same issues as those flagged by the Court in *Pelkey* under § 5K2.3. The former focuses on the people targeted by the defendant to accomplish his criminal conduct while the latter focuses on the actual harm that resulted from the criminal conduct. *See United States v. Haggard*, 41 F.3d 1320, 1327 (9th Cir.1994); *United States v. Bailey*, 892 F.Supp. 997, 1005 (N.D.Ill.1995); *United States v. Astorri*, 923 F.2d 1052, 1055 (3d Cir.), *cert denied*, 502 U.S. 970, 112 S.Ct. 444, 116 L.Ed.2d 462 (1991).

little information, but because of the adverse impact Skodnek's actions had—and are likely to have—on their reputations, careers, and their trust in mental health professionals.

A review of Skodnek's schemes makes this point clear: As a psychiatrist, Dr. Skodnek regularly filed claims with insurance carriers with respect to client sessions. He defrauded the carriers by filing such claims for sessions he falsely stated were held with people who were not his patients. To make this scheme work, Skodnek created official records purporting to show that they suffered from grave mental and emotional problems, drug addiction and abuse, and so forth.

There is no reason to believe that this misinformation will not lead to misfortune for those whose names Skodnek used in fabricating the sessions. This is an information age. While nominally confidential, these records are vulnerable to disclosure to any number of sources. Whether it should or not, the misinformation will almost certainly have an impact on patients' lives. It may determine whether an individual will be given a health insurance policy; it may decide whether he or she will receive government clearance; it may affect a whole host of other situations.

Dr. Skodnek's abuse of trust—and its unquestionable impact on his patients' lives and the lives of their family members—are very, very troubling.[31] And, what is unusual about this fraud scheme is not that Dr. Skodnek "puffed" the time he spent but went much, much further. He created a paper trail for these patients out of whole cloth, inventing histories of mental health treatment with which those individuals must now contend.

We cede so much to psychiatrists. The impact of Dr. Skodnek's malfeasance on his patients and their families is incalculable, out of the ordinary and could certainly warrant upward departure.

### B. *Downward Departure*

However, the vectors cut in the other direction as well.

The defense moves for downward departure based on Skodnek's diminished capacity under § 5K2.13.[32] Section 5K2.13, where the facts bear it out, forms the basis for an encouraged departure, as that has been characterized in *Rivera,* 994 F.2d at 948.

■■■ The defendant has offered substantial documentation of his disturbed mental state during and after the offenses that formed the basis of the indictment against him. The story begins with what appears with a troubled childhood and family life.

---

31. Blue Cross/Blue Shield Member No. 6 wrote to the Court regarding the difficulty she was having in trying to remove false diagnoses and false psychiatric sessions concerning her two children, listed as Blue Cross/Blue Shield Member Nos. 7 and 8. Member Numbers refer to Patient Indices Filed under seal on January 25, 1996. In an interview by Special Agent Denis Drum, Bay State Member No. 29 stated that "upon learning about the things SKODNEK had done regarding her insurance coverage, she is concerned about obtaining future health insurance coverage ... because her husband is self-employed." *See also* Addendum to Presentence Report at p. 22, n. 4 (non-patient applied to Boston Police Department; Skodnek had falsely reported severe depression and numerous psychiatric sessions).

The evidence suggests that once the claims were entered they cannot be deleted from the system. The most that can be done is to enter a notation in the computer records to reflect that a particular claim was false. In order to accomplish this, each member is obliged to write to Blue Cross/Blue Shield disputing the individual records. Moreover, even where a notation is entered to show that the billing record was false,

the insurance carrier cannot declare—and the notation will thus not reflect—whether Skodnek's statements about diagnosis, medications prescribed and/or psychiatric symptoms of the patient were false.

Thus, the information remains subject to disclosure pursuant to subpoena and court order. Claims information, for instance, is exchanged to coordinate payment of benefits where a member has coverage through more than one carrier, or exchanged with an auto carrier when an automobile accident generates a claim for medical injuries.

32. The Guidelines provide as follows:

If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.
U.S.S.G. § 5K2.13.

His father, believing in the now discredited Reichian psychiatry, sent him to a psychiatrist of like mind, who put him naked in an "orgone" box, and physically and verbally abused him. His sister mutilated herself by swallowing Draino, and then finally committed suicide. He found himself in an abusive marriage, in which he was the target of verbal and physical abuse.

This history certainly is troubling and gives a context to the crimes of which Skodnek has been convicted. From my position as a trial court judge, I must now consider this defendant in terms of others I have sentenced, to assure that the goals of the Guidelines are met.[33] Indeed, it is largely the work of the trial judge to put such factors in context. *Lindia,* 82 F.3d at 1165; *Rivera,* 994 F.2d at 951.

While the Guidelines speak particularly of ensuring uniformity of sentencing among offenders with similar records, departure decisions based on the diminished capacity of the defendants should—surely—reflect a certain consistency across classes of defendants. I am concerned that, more often than not, defendants who come before this Court who have neither Dr. Skodnek's access to legal services nor his own expertise in psychiatry, lack the words to describe their impairments and therefore their—maybe very real—diminished capacity is not considered. I recall other defendants before me, defendants awaiting sentencing on drug charges. In many a case, at sentencing there were intimations of a profoundly disturbed family situation. But there were no words to express the defendant's feelings, no resources to identify the problem, and no theories to explain it. I question whether there is a demonstrable difference between a rich young man put in an orgone box and a man in the grip of poverty with a cocaine addicted mother and absent father.

This is troubling. Still, I cannot say that because these other individuals lacked the

resources to document their psychic pain, I am obliged to ignore Dr. Skodnek's.

The crime is, to begin with, incomprehensible in rational terms. Dr. Skodnek is worth millions. Some of the patients for whom he submitted false billing records to their insurers could have paid for his services outright. The documentation from extremely credible and respected practitioners cannot be ignored.

Doctors Bursztajn and Kennedy testified that Skodnek has been long afflicted by mental disorders which have worsened and become more manifest since his sister's self-mutilation and suicide in 1982 and the collapse of an abusive marriage in 1989. They testified further that he had a biological disposition to major mental illness. Their diagnosis was that he had a major depressive disorder (as defined in the Diagnostic and Statistical Manual IV (DSM IV) 296.34), a psychotic disorder (DSM IV 298.9), an obsessive compulsive personality disorder (DSM IV 300.5) with self destructive compulsions. Dr. Strasburger agreed, finding Skodnek afflicted by a major depressive disorder, affecting his behavior, diminishing his capacity to act and his judgment, that his thought processes were tangential and disconnected, with difficulty distinguishing major issues from minor details. Doctors Lerner and Kennedy, both specialists in the Rorschach test, found the results of Skodnek's test to indicate severe cognitive distortion.

Under these circumstances, notwithstanding my reservations, I believe that Skodnek's diminished capacity could well be a basis to depart downward.

### D. *Summary*

With possible bases to depart in both directions, I ultimately find that I remain in the heartland of the Guidelines. I decline to depart from the established Guideline range of 23.

---

**33.** The Sentencing Guidelines were designed to "provide certainty and fairness ... in sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors." 28 U.S.C. § 991(b)(1)(B); U.S.S.G.App. B.

I sentence defendant Skodnek to 46 months to be served concurrently on each count of conviction.

## V. FINE

The government urges this Court to grant an upward departure from the fine range listed in U.S.S.G. § 5E1.2(c). The government argues that Section 5E1.2(e) suggests that departure is required in this case, noting that it states: "[t]he amount of fine should always be sufficient to ensure that the fine taken together with other sanctions imposed is punitive." In addition, the government argues, 18 U.S.C. § 3571(b)(3) permits a maximum fine of $250,000 for each of the 136 counts in this indictment, while the guideline range is from $10,000 to $100,000. *See* U.S.S.G. § 5E1.2(c)(1) & (c)(2).

The government makes a persuasive point.

Under Section 5E1.2, the court is obliged to impose a fine within the Guidelines' range unless the defendant proves that he or she is unable and not likely to become able to pay it. Also, where a sentence within the applicable fine guideline range would be insufficient to ensure both the disgorgement of any gain from the offense that otherwise would not be disgorged (e.g. by restitution or forfeiture) and an adequate punitive fine, an upward departure may be warranted. *See* U.S.S.G. § 5E1.2, Application Note 4 (emphasis added);[34] *United States v. Wilder,* 15 F.3d 1292, 1300 (5th Cir.1994). In addition, the fine may well take into account the expected costs of imprisonment, supervised release, or probation as detailed in the presentence report. 18 U.S.C. § 3572(a)(6); U.S.S.G. § 5E1.2(i).

In this case, if the total loss is $432,681, the fine range under the Guidelines represents only a fraction of the loss, and is obviously inadequate. The defendant has the ability to pay the fine, since it was stipulated at trial that he has more than $10 million in assets. *See* U.S.S.G. §§ 5E1.2(a) & (d)(2).

Therefore I will impose on this defendant a fine of $250,000 on each of Counts I, II, III, IV, of the superseding indictment, covering not only the punitive purposes of the fine, but as well the costs described above.

## VI. RESTITUTION

The government seeks an order of restitution, totalling $652,125.39, in the following amounts:

$326,839.16  payable to Bay State Health Care;
$311,641.51  payable to Blue Cross/Blue Shield;
$ 13,644.72  payable to Medex.[35]
$109,660.00  payable to Blue Cross/Blue Shield for administrative expenses of investigation.

Since the government bases their amounts on the extrapolated figures with which I disagree, I will not accept their computation. Restitution is ordered in the following amounts:

| BSHC | $160,207.76 |
|---|---|
| BCBSMA | 23,722.67 |
| MEDEX | 12,401.87 |
| TOTAL | $196,332.30 |

## VII. OTHER TERMS

I also sentence Skodnek to three year supervised release to run concurrently on each count pursuant to 18 U.S.C. § 3583(b).

I have also imposed a mandatory special assessment of $6800 ($50 on each of the 136 counts of conviction, pursuant to 18 U.S.C. § 3013).

**SO ORDERED.**

---

**34.** Indeed, the Sentencing Commission "envision[ed] that for most defendants, the maximum of the guideline fine range ... will be at least twice the amount of gain or loss resulting from the offense. Where, however, two times either the amount of gain to the defendant or the amount of loss caused by the offense exceeds the maximum of the fine guideline, an upward departure from the fine guideline may be warranted." U.S.S.G. § 5E1.2(c)(3), Application Note 4.

**35.** The government does not seek restitution in this proceeding with regard to Medicare because the government intends to seek separate civil damages for false claims filed against the United States. In addition, the government does not seek restitution with regard to the Tufts Health Care Plan because Tufts separately settled the issue of civil damages for false claims filed by the defendant.